UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------------------------x
                                            :
UNITED STATES OF AMERICA        :        Criminal No. 3:20-cr-261 (MPS)
                                            :
v.                                          :
                                            :
ALEXANDER SANTIAGO             :
                                            :        May 3, 2022
-----------------------------------------------------x
```

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

For the reasons that follow, the Court should impose a 46-month sentence in this case. Despite growing up under difficult circumstances in the Bronx, Mr. Santiago, now 27 years old, has no prior felony record and has never served a sentence of incarceration. Despite a significant learning disability, Alex has built a meaningful record of employment. He has also, to be sure, participated in a serious of serious burglaries over several months. As discussed below, the Burglary guideline set out in § 2B2.1 effectively captures the core offense conduct in this case and supports imposition of the proposed 46-month sentence, a substantial sanction for someone who has never before served a prison sentence. The guidelines calculated in the PSR, by contrast, are deeply flawed and unhelpful for a number of reasons outlined below.

## BACKGROUND AND HISTORY

For Alex Santiago growing up, "life at home was 'good[.]'" PSR ¶ 98. Or at any rate, Alex managed to find the good in it. "Mr. Santiago's mother, who was in her early 20s when he was born, abandoned him, and [his father] who was approximately 17 years old when Mr. Santiago was born, was 'a street guy,' who was never home, and emotionally unavailable for his children"—and that was during the intermittent periods when he was out of prison. PSR ¶ 101 (quoting Mr. Santiago's paternal aunt).

Fortunately for Alex, he had other family willing to help care for him in the ways that his parents could not. His grandfather worked as a tow truck driver—work that Alex would himself later pursue—and his grandmother was at home on disability. Thanks to the presence of his grandparents and aunts, Alex experienced material stability, though as his aunt Zuleika recalls, "She saw the frustration he experienced from not having his parents around." PSR ¶ 102.

And as much as his grandparents worked to fill the role of parents, his grandmother's health problems left her to look to Alex for help. Alex's younger cousin, who looked up to Alex as an older brother who "always knew what to say when I felt insecure, fed me when I was hungry and made sure I was safe from the other kids who would constantly bully me because of my appearance" writes in his letter, attached as **Exhibit 1**, that "Alexander not only took care of my siblings and I, but I would notice how much our grandmother would depend on him to complete house chores and quick meals." Alex's grandmother shares similarly in her letter, attached as **Exhibit 2**, that "I observed him caring for and appreciating his family. I've witnessed the impact of his parents absence in his life. He had to make sure he took care of his younger siblings. . . . When I was sick, Mr. Santiago would always take care me. He would cook for me,

assist me in cleaning the house, and assisting me in getting back on my feet whenever I felt I couldn't."

As a child, Alex also struggled with significant learning deficits substantial enough to warrant his receiving disability benefits, and was placed in special education classes, where he would remain through his departure from high school. PSR ¶ 102. As Alex explains (and his education records discussed in PSR ¶ 110) reflect, Alex became increasingly distracted and pulled away from school as a teenager when he got his first car. PSR ¶ 99.

Alex's fascination with cars was one of his few inheritances from his father, *id*., and while this attraction pulled him away from school, it also opened up employment possibilities that Alex seized upon. For two years Alex worked consistently as a delivery driver for a restaurant; from there he moved on to work for a further year as a delivery driver at another restaurant. PSR ¶¶ 114-15.

With no high school diploma or even GED,[1] Alex faced extremely limited prospects for getting a better job, prospects hardly improved by his home life. As his cousin Pablo recalls in the letter attached as **Exhibit 3**, "He's been through alot at such a young age with not having his father around, Living with his grandmother who always wanted to take care of him but couldn't because she was always sick in and out of hospitals and nursing homes. There were times he had to sleep in his car because no one would be home. He just didn't have anyone to be there for him[.]" Even with his own difficulties, Pablo recalls, Alex was there for his family: "I remember he used to work at a Kennedy fried chicken as a delivery boy and whenever I was hungry he would always take me to get whatever I wanted." *Id*.

---

[1]Alex has tried to obtain a GED on multiple occasions but has struggled with distractions. He is currently enrolled in classes at Wyatt.

Despite Alex's limited education and prospects, driving offered an avenue towards success. He obtained a tow truck CDL license and following in his grandfather's footsteps he began working as a tow truck driver.

Alex lost his tow truck job after falling into one of the many debt traps of working class American life. He accrued driving fines, including for driving without proper insurance and registration, in connection with his personal vehicle. As the fines racked up—reaching $3,000— and he was unable to pay them, the state suspended his CDL license. Without the license, he had no tow truck job, and no effective way of paying down the debt that kept him from working again as a driver.

There were, to be sure, bright spots in Alex's life even in this time leading up to his descent into the offense conduct in this case. His daughter, now 8, stood out as "the love of his life," as his aunt puts it, and Alex played the dominant parental role in her life. PSR ¶ 103.

In 2020, Alex met his current partner, Sabrina. Sabrina had three children of her own when they met, and her brother Lea shares in the letter attached as **Exhibit 4** that "He treats my sister very kindly as well as her children that are not his biologically. It is a shock to me, because it is rare to see a man love and have so much care as he does." Sabrina's sister elaborates in her letter, attached as **Exhibit 5**, that "Alexander has greatly impacted mine and my sister's life because he saved her from an abusive husband who was mentally and physically abusing my sister since she was 16 years old. Alexander never had false intentions and always had a kind heart. Despite her situation he took her in with open arms and helped support her when times were hard and very tough."

For her part, Sabrina has remained supportive and engaged in Alex' life. The couple now share a 10-month-old son. PSR ¶ 104. As a result of his actions in this case, Alex has been in

4

custody for the entirety of his son's life to date. Sabrina shares, in her letter attached as **Exhibit 6**, that " All they joy and smiles were gone once alex was taken away[.] I gave birth alone[,] Alex wasn't able to be there for the birth of his first son[.] his mother got more sick led her to her death[.] his grandmother got more sick had heart surgery had a seizure almost died within seconds now lost her memory as alex witness these events. He blames himself for the loss of his loving mother and grandmother knowing he's all they had depended on him and he feels like he's let them down and it's his fault he will never be able to forgive himself[.]"

### MR. SANTIAGO IS NOT RESPONSIBLE FOR ALL CALCULATED LOSSES

Based upon the undisputed facts with respect to the guidelines loss amount in this case, the government cannot sustain its burden of demonstrating by a preponderance of the evidence that the loss amount attributable to Mr. Santiago exceeds $3.5 million.

As the PSR sets out, the approximate total loss amount attributable to the activities of the various defendants in this case is $4,080,882. PSR ¶ 142. The PSR also reflects that approximately $700,000 of that total loss arises from incidents in which the evidence points to the participation of a specific uncharged individual. PSR ¶ 6. In contrast with other charged defendants in this case, "[t]he available evidence does not indicate that Alexander Santiago was present for any of the burglaries that involved" this person. *Id.* (emphasis in original). Mr. Santiago's consistent absence from these burglaries is explained by the fact that "prior to the offense conduct in this matter," the two "had a falling out and therefore, [Mr. Santiago] did not involve himself with, or profit from, any activities involving" this person. PSR ¶ 5.

The Sentencing Guidelines provide general guidance concerning the degree to which the actions of others may qualify as relevant conduct for sentencing purposes. USSG § 1B1.3(a)(1)(B) specifies that "in the case of a jointly undertaken criminal activity (a criminal

plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," relevant conduct includes "all acts and omissions of others that were-- (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity" and that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

The United States Sentencing Commission in its 2021 "Primer on Loss" has provided guidance concerning the proper scope of a defendant's liability for the acts of others, explaining that:

> Furthermore, the loss figure is not limited to the losses that are directly attributable to acts of the defendant. Losses caused by the acts of co-conspirators that were reasonably foreseeable to the defendant should also be included in the loss calculation. **The sentencing court should, however, limit the defendant's liability to those acts of co-conspirators that were reasonably foreseeable and part of the criminal activity that the defendant "agreed to jointly undertake."**

Office of General Counsel U.S. Sentencing Commission, "Loss Primer (§2B1.1(b)(1))" (2021) (available at https://www.ussc.gov/sites/default/files/pdf/training/primers/2021_Primer_Loss.pdf (emphasis added; footnotes omitted).

Among the cases the Commission points to in support of this principle is the Ninth Circuit's decision in [Treadwell] in which the court articulated (reflecting prior holdings) that "a district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the

defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010), *overruled in part on other grounds by United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).

The Second Circuit has set out this requirement as involving what have become known as "the so-called Studley prongs: (1) that the scope of the activity to which the defendant agreed was sufficiently broad to include the [relevant, co-conspirator] conduct in); and (2) that the relevant conduct on the part of the co-conspirator was foreseeable to the defendant[.]" *United States v. Johnson*, 378 F.3d 230, 236 (2d Cir. 2004) (internal quotation marks omitted); *United States v. Studley*, 47 F.3d 569, 574 (2d Cir.1995).

A 2017 decision in the Southern District of New York further explains that

The scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991); see U.S.S.G. § 1B1.3 cmt. n. 1. This is because "the emphasis in substantive conspiracy liability is the scope of the entire conspiracy," while "the emphasis under [the Guidelines] is the scope of the individual defendant's undertaking." *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008) (emphases in original).

*United States v. Rigo*, No. 13 CR. 897 (RWS), 2017 WL 213064, at *3 (S.D.N.Y. Jan. 17, 2017)

In this case, the "scope of the jointly undertaken criminal activity," 1B1.3(a)(1)(B), that Mr. Santiago agreed to participate in had a clear and definitive limitation: Mr. Santiago "did not involve himself with, or profit from, any activities involving" a specific individual. PSR ¶ 5. For Mr. Santiago, the logic was simple: if he's in, I'm out. And with respect to the set of burglaries involving this person, there is accordingly no indication that Mr. Santiago was present. Mr. Santiago consequently should not be held responsible for activity that he not only declined to

participate in, but that fell outside the scope of his agreed-upon involvement in the offense conduct.

## THE FACTS OF THIS CASE DO NOT SUPPORT A LEADERSHIP ENHANCEMENT

The PSR in this case applies a 2-level enhancement under USSG § 3B1.1(c) based upon Mr. Santiago's claimed role as an organizer, leader, manager, or supervisor. PSR ¶ 82. Under the facts of this case, however, the government cannot sustain its burden of demonstrating that this enhancement properly applies.

The role enhancements contemplated in § 3B1.1 refer specifically to the relationships among participants in an offense. Application Note 2 specifies that

> [t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

As this note lays out, the Commission recognizes a distinction between performing managerial tasks and actually giving orders to other participants. The guidelines commentary shows that only the latter triggers § 3B1.1. *See United States v. Greenfield,* 44 F.3d 1141, 1146 (2d Cir. 1995) ("by negative implication, the Application Note seems clearly to preclude management responsibility over property, assets, or activities as the basis for an enhancement under § 3B1.1(c).

The commentary to § 3B1.1 also clarifies that "[t]his adjustment does not apply to a defendant who merely suggests committing the offense." *Id*. at Note 4. The role enhancement,

that is to say, is not a mechanism for penalizing the first mover, at least absent evidence of a hierarchical relationship that puts a particular defendant in the position of ordering action, rather than merely suggesting it.

The evidence in this case does not show that Mr. Santiago was in a position to order anyone to do anything. Rather, the available evidence points to loosely organized collective action on the part of a shifting cast of participants. As discussed above with respect to the issue of loss, the evidence shows Mr. Santiago did not have the ability to exclude others from participating in burglaries; instead, all he could do if he did not want to associate with another participant was to exclude himself. With respect to a substantial number of burglaries, that is exactly what Mr. Santiago did—and those burglaries went ahead without him.

The evidence in this case does not show that Mr. Santiago gave orders to anyone. It does not show that Mr. Santiago profited in any disproportionate way. It does not show Mr. Santiago was necessary to the offense. The evidence does show that Mr. Santiago participated at least to some degree in planning and logistics—but it does not demonstrate that Mr. Santiago was unique in this regard, and a number of burglaries occurred without his involvement at all. The available evidence shows that the defendants in this case worked together not in a hierarchical organization but in a loose coalition of coequal confederates. A decision in the Eastern District of New York has examined a similar set of circumstances in which a conspiracy

> operated in the same way a "law firm works with separate partners." . . . "It is like a lawyer bringing in a client and then all the partners of the firm working on the matter and sharing in the proceeds."  Norris, Hall, and Mitchell were "coequals" and Norris "had no responsibility for ordering them to do any particular task."

*United States v. Norris*, 277 F. Supp. 2d 189, 195 (E.D.N.Y. 2003) (citations omitted). Under these circumstances, the Court in *Norris* appropriately held that the government could not sustain

9

its burden of showing that § 3B1.1 applied. *Id. See also United States v. Katora,* 981 F.2d 1398, 1402–03 (3d Cir. 1992) ("Just as section 3B1.1 cannot enhance the sentence of a solo offender . . . neither can it enhance the sentences of a duo when they bear equal responsibility for 'organizing' their own commission of a crime").

Even absent direct relationships of control, an organization can sometimes still have a clear hierarchy with someone at the top, but under these circumstances to "be found 'responsible for organizing others,' and thereby subject to a § 3B1.1 enhancement, a defendant must have at least played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Greenfield*, 44 F.3d 1141, 1147 (2d Cir. 1995). The PSR contains conclusory references to Mr. Santiago "recruiting" others (*see* PSR ¶ 25). The PSR, however, notably lacks any factual statements providing any indication of what "recruit" means here.[2] It certainly does not substantiate that Mr. Santiago recruited "lower-level participants" who occupied a subordinate place in any hierarchy. Section 3B1.1 does not contemplate enhanced penalties for a participant who merely invites others to join in as equal members.

## THE "ORGANIZED SCHEME TO STEAL VEHICLES" ENHANCEMENT SHOULD NOT INFLUENCE THE SENTENCE IMPOSED

Section 2B1.1 of the Sentencing Guidelines includes an enhancement specifying that "If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels. If the

---

[2] The PSR suggests that "After Mr. Cartagena's arrest, Mr. Santiago continued to recruit individuals to conduct burglaries." ¶ 25. While burglaries involving Mr. Santiago continued after Mr. Cartagena's arrest, Defendant is not aware of any evidence pointing to the addition of new members of the conspiracy in this time. Defendant therefore objects to this use of "recruit."

resulting offense level is less than level 14, increase to level 14." USSG § 2B1.1(b)(15).

Defendant agrees that this enhancement technically applies. However, for the reasons that

follow, the Court should not rely upon this enhancement in crafting the sentence in this case.

To begin with historical context, from 1989[3] to 2007 the "organized scheme to steal

vehicles" enhancement specified only that "If the offense involved an organized scheme to steal

vehicles or vehicle parts, and the offense level is less than level 14, increase to level 14." USSG

§ 2B1.1(b)(11) (2006). The provision, that is to say, made no mention of cargo shipments and

contained no automatic 2-level enhancement. Commentary to the provision stated (as it still

does) that:

> A minimum offense level of level 14 is provided for offenses involving an organized
> scheme to steal vehicles or vehicle parts. Typically, the scope of such activity is
> substantial, but the value of the property may be particularly difficult to ascertain in
> individual cases because the stolen property is rapidly resold or otherwise disposed of in
> the course of the offense. Therefore, the specific offense characteristic of "organized
> scheme" is used as an alternative to "loss" in setting a minimum offense level.

USSG § 2B1.1 "Background" (2006). The same language persists in the commentary to the

present version of the Guidelines.

So whence the 2-level enhancement? Guidelines Amendment 699, effective November 1,

2007, offers the answer:

> Section 307(c) of the PATRIOT Reauthorization Act directed the Commission to review
> the guidelines to determine whether a sentencing enhancement is appropriate for any

---

[3] The first version of the Guidelines published in 1987 included the offense level floor of 14 for
all "organized criminal activity," USSG § 2B1.1(b)(6) (1987), citing as specific examples of
such activities "car theft rings or 'chop shops[.]'" *Id* (Background). Amendment 100 effective
November 1, 1989, replaced this language with the specific reference to vehicle thefts, noting the
change was to "clarify the coverage of a specific offense characteristic."

offense under sections 659 or 2311 of title 18, United States Code. This amendment responds to the directive by revising the enhancement at subsection (b)(11) of §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States). The amendment expands the scope of this enhancement to cover cargo theft and adds a reference to the receipt of stolen vehicles or goods to ensure application of the enhancement is consistent with the scope of 18 U.S.C. §§ 659 and 2313. The Commission determined that the two-level increase, and the minimum offense level of 14, appropriately responds to concerns regarding the increased instances of organized cargo theft operations.

Per the Commission, this harshened version of the "organized scheme to steal vehicles" provision arose (as is so often the case with harsh and puzzling guidelines provisions) not from the Commission's own independent review of the guidelines, but rather from a political directive from Congress—here a provision of the PATRIOT Act. The Commission's response to this political directive included a 2-level enhancement to respond to "concerns regarding the increased instances of organized cargo theft operations." *Id.*

So the Sentencing Commission, left to its own devices, had crafted a sentencing floor intended to address a concern that a particular form of criminal conduct involving vehicle thefts might be inherently extensive (*i.e.* constituting the basic business model of a chop shop) but difficult to quantify. Such a concern has no place here: the government has extensively quantified the loss in this case—and those losses take this case well above offense level 14. The animating logic of pre-PATRIOT Act enhancement does not support any enhancement here.

The additional 2-level PATRIOT Act enhancement does not respond to the problem of quantification; rather, it responds to Congress. Such guideline amendments often raise questions

as to whether they represent an exercise of the Commission's empirical study and expertise. *See, e.g. United States v. Dorvee,* 616 F.3d 174, 184 (2d Cir. 2010) (observing that "the Commission did not use this empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties"). Here, not only was the Commission responding to Congress when it amended § 2B1.1, but it was responding to specific perceived problem—"concerns regarding the increased instances of organized cargo theft operations," Amendment 699—that have no relation to this case.

In short, close scrutiny of the guidelines shows that there is no good reason for a two-level enhancement here simply because the offense involved stolen vehicles rather than some other object. More concretely, this case is not, in practical terms, 2 levels more serious than it would have been if the defendants had stolen an equivalent value of phones and cash exclusively. Even to the extent that stolen vehicles participated in flight from authorities, the guidelines separately provide for an enhancement (applicable here) based on reckless flight.

## APPLICATION OF BOTH THE "ORGANIZED SCHEME TO STEAL VEHICLES" AND ROLE-BACED ENHANCEMENTS WOULD RESULT IN DOUBLE COUNTING

For the reasons discussed above, the Court should not apply a role-based enhancement under § 3B1.1 and should not give weight to § 2B1.1(b)(11) in reaching the sentence in this case. In addition to the individual infirmities of these enhancements, combining them together under the circumstances of this case results in problematic double-counting.

*In U.S. v. Greenfield*, the Second Circuit explained that "an increase under § 3B1.1(c) could not be based solely upon Greenfield's extensive planning and preparations in connection

with the schemes. To do so would involve impermissible 'double-counting' in light of the fact that Greenfield had already been assessed an enhancement under § 2F1.1(b)(2), which applies to criminal conduct involving more than minimal planning." *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995). In the accompanying footnote, the Court added that under some circumstances both enhancements might apply, but that "a sentencing court cannot, in addition to an increase for 'more than minimal planning,' apply a role-in-the-offense enhancement premised solely upon the extensiveness of the defendant's preparations and planning. By doing so, the sentencing court would be impermissibly relying upon the same facet of the defendant's conduct to justify two enhancements." *Id*. at

The specific "more than minimal planning" enhancement identified in *Greenfield* has long since been eliminated (in a 2001 consolidation of § 2F.1.1 with § 2B1.1, though the language remains in § 2B2.1), but its emphasis on the existence of planning as a basis for an enhancement bears structural similarities to § 2B1.1(b)(15)'s emphasis on the existence of an "organized scheme." To the extent that the Court would be inclined to impose a role adjustment based on Mr. Santiago's organizational rather than managerial role (a problematic proposition for the reasons discussed above) doing so would be particularly inappropriate here where another enhancement directly addresses the organized nature of the offense.

**THE LOSS TABLE IN § 2B1.1 DOES NOT PROVIDE A RELIABLE EMPIRICAL FOUNDATION FOR SENTENCING**

In calculating Mr. Santiago's offense level, the loss table in U.S.S.G. § 2B1.1 *quadruples* the base offense level, moving it from 6 to 24. PSR ¶ 77. The Guidelines' reliance on loss tables as the driving determinant of the offense level for property offenses has been extensively—and appropriately—criticized by judicial and academic authorities. Summarizing these concerns, the

14

Second Circuit in 2016 remanded for resentencing a case in which application of the fraud loss table increased the defendant's base offense level from 6 to 16. In so doing, the Second Circuit instructed the district court on remand "to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *United States v. Algahaim,* 842 F.3d 796, 800 (2d Cir. 2016).   Discussing its reasons for the remand, the Court explained:

> [T]he Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider. *See Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination); *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (in banc) (same). Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence. *Cf. United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (cumulative effect of overlapping enhancements warranted consideration of departure), *reh'g denied*, 362 F.3d 160 (2d Cir. 2004); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) (same).

*Id*.

In openly inviting (and indeed instructing) sentencing courts to consider whether to set aside the loss table on policy grounds, the Second Circuit invoked the Supreme Court's decision in *United States v. Kimgrough*, in which the Supreme Court had explained that the crack cocaine guideline, which "did not take account of empirical data and national experience," was not entitled to deference. 552 U.S. at 109 (internal quotation marks omitted). In so doing, the Court in *Algahaim* reflected the reality that Judge Underhill, sitting by designation in the Second

Circuit, observed in a 2013 concurring opinion: "the loss guideline, like the child pornography guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, D.J., concurring).

The problem with the loss table is not merely that lacks a solid empirical foundation. More fundamentally, as a number of decisions have lamented, in adopting a single-minded focus on loss and "making a Guideline sentence turn, for all practical purposes, on this single factor . . . [the] Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). *See also, e.g., United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").[4]

---

[4] Even the Sentencing Commission recognized there was a problem and concluded "a comprehensive, multi-year study of § 2B1.1 . . . and related guidelines, including an examination of the loss table and the definition of loss . . . ." 78 Fed. Reg. 51820-51821.  Unfortunately, the Commission's study produced only marginal amendments that do not speak to the fundamental injustice of a Guideline that has no empirical support or analytical rigor.

**THE COURT SHOULD LOOK TO THE ACTUAL BURGLARY GUIDELINE INSTEAD OF § 2B1.1.**

Highlighting the anomalous consequences of reliance on the § 2B1.1 loss table further, the Guidelines provision specific to the core offense in this case—burglary—suggests a very different guidelines range than § 2B1.1 does.[5] The Court should look to that Guideline, which captures the core of the actual offense conduct here, into account in crafting the sentence in this case.

The burglary guideline, § 2B2.1 sets a base offense level of 12 for non-residential burglaries. Per §2B2.1(b)(1), a 2-level enhancement would apply for "more than minimal planning." Section 2B2.1(b)(2) would provide a further 6-level enhancement for the loss amount of between $3 million and $5 million. Finally, §2B2.1(b)(4) would increase the offense by a further 2 levels for possession of a firearm. This would result in a total offense level (prior to chapter 3 enhancements) of 22. The § 2B1.1 guidelines, by contrast, clock in at 30—fully eight levels higher.[6] Most of that difference can be attributed to the operation of the § 2B1.1 loss table in contrast with the § 2B2.1 loss table.

After accounting for the reckless flight enhancement and acceptance of responsibility, the Burglary guideline would result in a final offense level of 21 and a guidelines range of 37 – 46 months. Even a further enhancement based on a role adjustment would result in a range of 46 – 57 months. This is less than *half* of the range calculated in the PSR under § 2B1.1. For the

---

[5] USSG § 1B1.2 instructs courts to rely on the Statutory Index (Appendix A) to determine the applicable guideline based on the offense of conviction. Here, the offense of conviction, 18 U.S.C. § 2315, possession of stolen property, points to § 2B1.1

[6] This figure includes the full amount of loss calculated in the PSR. Reducing the loss by $700,000 for the reasons above would reduce the offense level to 28 prior to chapter 3 adjustments.

reasons that follow, the guideline that factually best matches the facts of this case--§ 2B2.1—provide much more appropriate guidance to the Court and result in a much more appropriate recommended sentence. Indeed, Defendant's proposed sentence of 46 months lies within the heartland of sentences recommended by this guideline (even including a contested enhancement).

## THE 3553(A) FACTORS SUPPORT THE PROPOSED SENTENCE

The correctly calculated Guidelines range in this case is 70 – 87 months.  While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines, it is not bound by that range. What the Court is bound by is the dictate of 18 U.S.C. § 3553(a) that the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Consequently, as the Second Circuit explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See id*. at 142 (where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).  As discussed below, a sentence of 48 months is sufficient to achieve the goals of sentencing here.

### Mr. Santiago's History and Character Support the Proposed Sentence.

Alexander Santiago did not grow up sheltered from the harshness of the world. The conditions of his childhood—of fragmented parental support, of exposure to parental addiction, of education cut short too soon—were practically designed to incubate escalating youthful criminal conduct and with it a growing criminal record. But that has not been Mr. Santiago's

story. Instead, as his life course and family letters attest, Alex has worked hard despite his

disadvantages to be a source of care and support to those around him.

His actions in this case notwithstanding, Alex's foundational history as a productive

worker and caring family member will serve him well upon his return to the community. And as

a statistical matter, "Minimal or no prior involvement with the criminal justice system is a

powerful predictor of a reduced likelihood of recidivism." *United States v. Germosen*, 473

F.Supp.2d 221, 227 (D. Mass. Jan. 18, 2007) (Gertner, J.). (citing United States Sentencing

Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category

and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005), http//

www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf ). That Mr. Santiago has accrued no

felony record despite growing up in the circumstances he did bodes well for his ability to return

to the community as a law-abiding and productive citizen.

Alex, moreover, understands that the offense in this case is a serious one—and could

have had even more serious consequences. A letter from Mr. Santiago will follow.

### A Four-Year Sentence Is Sufficiently Punitive.

It need hardly be said, but four years is a long time. It is an especially long time to spend

in prison. And that time has been made even harsher, as Mr. Santiago has already experienced

during his detention during the past 15 months, by the protocols that prisons have put in place

during the COVID-19 pandemic. Prison lockdowns, often for 23 hours a day, have become

routine, driven it seems both by efforts to control the spread of COVID and also by staffing

shortages and other problems. Prison right now is much harsher than it used to be, and it is not

clear when that might change. More, in the time that he has been incarcerated, Alex has missed

both the birth of his son and the passing of his mother, who died due to preexisting health

conditions and COVID-19. PSR ¶ 97.  His grandmother's health and cognitive functioning have

also precipitously declined in this time. Particularly in this context, a sanction of 46 months'

incarceration has real bite.


**The Court Should Account for Collateral Consequences in Fashioning a Sentence.**

In a somewhat harsh irony, Mr. Santiago's lack of a prior felony record makes the

consequences of this conviction more severe. Because of his conduct in this case, Alex Santiago

is now—and will be for the rest of his life—a convicted felon. This is a life-altering mark. As a

Court in the Eastern District of New York recently outlined,

> Remarkably, there are nationwide nearly 50,000 federal and state statutes and
> regulations that impose penalties, disabilities, or disadvantages on convicted felons. Of
> those, federal law imposes nearly 1,200 collateral consequences for convictions generally,
> and nearly 300 for controlled-substances offenses. District courts have no discretion to
> decide whether many of these collateral consequences should apply to particular offenders.
> The result is a status-based regulatory scheme; by the very fact of an individual's
> conviction, he or she is subject to a vast array of restrictions.
> The range of subject matter that collateral consequences cover can be particularly
> disruptive to an ex-convict's efforts at rehabilitation and reintegration into society. As
> examples, under federal law alone, a felony conviction may render an individual ineligible
> for public housing, section 8 vouchers, Social Security Act benefits, supplemental
> nutritional benefits, student loans, the Hope Scholarship tax credit, and Legal Services
> Corporation representation in public-housing eviction proceedings. Moreover, in addition
> to the general reluctance of private employers to hire ex-convicts, felony convictions
> disqualify individuals from holding various positions.

*United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (E.D.N.Y. May 24, 2016)

(footnotes omitted).[7] As the court further explained, the Second Circuit has approved of courts

including consideration of these consequences in crafting an appropriate sentence under § 3553(a).

---

[7] The United States appealed the decision in this matter but subsequently withdrew the appeal.
*See* Second Circuit Case 16-2081 Document 27.

*Id.* at \*7 - \*8; *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (stating that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence").

### The proposed sentence is sufficient to promote deterrence and respect for the law.

As discussed above, Alex Santiago's lack of prior felony record and acceptance of responsibility suggest that the need for specific deterrence may be of limited significance here. Moreover, as the Second Circuit has explained in *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), what specific deterrence that may be required could likely be achieved in this case with a comparatively modest sentence.

As to general deterrence, it is the fact of Mr. Santiago's punishment, not its magnitude that matters. As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no convincing evidence suggesting that harsher sentences deter." Webster, Cheryl Marie, and Anthony N. Doob. "Searching for Sasquatch: Deterrence of crime through sentence severity." The Oxford Handbook on Sentencing and Corrections (2012): 173-195, at 176. Recognizing that "effective deterrence arises from certainty, not harshness, of punishment," a decision in the Eastern District of New York sensibly asks whether "our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (Weinstein, J.).

Respectfully submitted,

THE DEFENDANT,
Alexander Santiago

OFFICE OF THE FEDERAL DEFENDER

Dated: May 3, 2022

/s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 3, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

s/ James P. Maguire
James P. Maguire